IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-661

 No. COA21-31

 Filed 7 December 2021

 Cabarrus County, No. 19CVD957

 TRINA THOMAS and SCOTTY THOMAS, Plaintiffs,

 v.

 KIMBERLY OXENDINE and BRIAN A. THOMAS, Defendants.

 Appeal by Defendant Kimberly Oxendine from orders entered 26 March 2019,

 10 April 2019, 11 June 2019, and 17 April 2020 by Judge Juanita Boger-Allen in

 Cabarrus County District Court. Heard in the Court of Appeals 22 September 2021.

 Kathleen Arundell Jackson for Plaintiff-Appellees.

 Ferguson, Hayes, Hawkins, & DeMay, PLLC, by James R. DeMay, for
 Defendant-Appellant.

 COLLINS, Judge.

¶1 Defendant Kimberly Oxendine1 appeals the trial court’s orders which

 culminated in sole legal and physical custody of her minor child being awarded to

 Plaintiffs, Trina and Scotty Thomas. We affirm the orders of the trial court.

 1 Defendant Brian A. Thomas is not a party to this appeal.
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 I. Factual and Procedural History

¶2 Defendants Kimberly Oxendine (“Mother”) and Brian A. Thomas (“Father”) are

 the biological parents of Josie,2 born in 2005. Plaintiffs Trina Thomas

 (“Grandmother”) and Scotty Thomas (“Grandfather”) (together, “Grandparents”) are

 Josie’s paternal grandparents. Mother, Father, Josie, and Skylar–Mother’s child

 from a previous relationship–lived in Grandparents’ home from 2006 to 2007. Father

 left Grandparents’ home in 2007 while Mother, Josie, and Skylar remained in the

 home until 2008.

¶3 Mother met Stephen Oxendine (“Chip”) in 2009. Mother, Josie, and Skylar

 moved into Chip’s home in 2010, and Mother and Chip married in 2014. The couple

 had two children together, Carson and Diane.

¶4 After Mother, Josie, and Skylar moved out of Grandparents’ home in 2008,

 Josie spent most weekends, parts of each summer, and every spring break with

 Grandparents. Grandparents picked Josie up from school when she was ill, took her

 to therapy appointments, and paid for and attended her school sporting events. They

 also provided her with clothing, school supplies, and other essentials on a regular

 basis, and had recently purchased her a laptop. Grandparents also paid most child

 support payments on Father’s behalf. Josie has a strong bond with Grandparents.

 Grandmother has been a “constant emotional resource” for Josie, and Mother relied

 2 We use pseudonyms in this case to protect the identity of the minor children.
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 on Grandmother’s guidance and support in parenting Josie.

¶5 Josie’s relationship with Chip was strained. Chip used unusually harsh

 punishment methods to discipline Josie, including forcing her to stay in an

 unairconditioned, unvented upstairs room during the summer, which “was far too hot

 for healthy living conditions.” Chip yelled at her and called her names. He would

 yell in her face, getting so close he would spew spit on her. Mother and Chip

 sometimes refused to let Josie stay with Grandparents as punishment. Chip had also

 threatened to kick Josie out of the house, telling her to “pack her things and leave.”

 Mother did not get involved when Chip was aggressive towards Josie. Josie is afraid

 of Chip and does not believe that Mother tries to protect her.

¶6 After bruises were found on Skylar’s buttocks in 2011, Cabarrus County social

 services3 investigated the Oxendine home. Social services closed the case, instructing

 Mother and Chip on proper discipline and recommending that they receive parenting

 and counseling services.

¶7 In May 2016, Josie wrote a letter stating she’d “rather kill herself” than live in

 the home with Chip. Mother had Josie admitted to Brynn Mar Hospital for

 treatment. Josie was admitted for depression and suicidal ideation and stayed in the

 hospital for nine days.

 3 Although documents bearing the names Cabarrus County Department of Social

 Services (CCDSS) and Cabarrus County Department of Human Services (CCDHS) are
 provided in the Record, these names refer to the same entity. We use “Cabarrus County
 social services” for consistency and to avoid confusion.
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

¶8 While Josie was being treated at Brynn Mar, Grandmother stayed with Josie.

 Mother visited but did not spend nights at the hospital as she feared Chip would be

 “mad” at her for leaving the other children. Mother told Grandmother that because

 of the strained relationship between Josie and Chip, she “knew it would come to this,”

 and that she had tried to talk to Chip but he would not listen.

¶9 Upon release from the hospital, Josie was prescribed anti-depressant

 medication and recommended for outpatient therapy. Mother enrolled Josie in

 therapy with Daymark Recovery Services and Turning Point Family Services. Josie

 reported to Daymark that she didn’t “feel safe around Chip” and that she was scared

 Chip would “get mad and hit her mother.” Daymark recommended the entire family

 enroll in in-home, teamwork therapy. No evidence was presented that the family

 followed through with Daymark’s recommendation. Josie only attended one session

 at Daymark and then stopped; Mother testified that this was due to Medicaid

 eligibility. Mother testified that Josie was in counseling with Turning Point for “quite

 a while” and then no longer needed treatment, but did not provide evidence to support

 her assertion.

¶ 10 On 19 February 2019, Chip discovered that Josie was using a cell phone that

 she was not permitted to have and confronted her. Chip “grabbed [Josie] by her

 shoulders, flinging her to the ground.” The following day, when Josie arrived home

 from school, Chip confronted her again and the situation escalated. That day, Mother

 called Grandmother and asked if Josie could stay with Grandparents because things
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 were “not working with [Josie] and Chip.” Grandparents agreed to have Josie stay

 with them. Josie stayed with Grandparents for about a week.

¶ 11 Following this incident, Cabarrus County social services received a report

 about the family. Mother suspected the report had been filed by Grandparents and

 demanded that Josie return home on 24 February 2019. Subsequently, Cabarrus

 County social services investigated the report, but closed the case with a

 recommendation that the Oxendine family obtain individual and family counseling

 services to address any discord present in the home.

¶ 12 Grandparents filed a Complaint for Child Custody and Motion for Emergency

 Custody on 26 March 2019. The trial court entered an Order for Emergency Custody

 on that date, awarding temporary emergency custody of Josie to Grandparents and

 setting the matter for a temporary custody hearing on 3 April 2019. Following the

 temporary custody hearing, the trial court continued temporary custody of Josie with

 Grandparents and determined that Mother should have contact with Josie, but that

 Chip should not. The trial court entered a written Temporary Custody Order on 10

 April 2019.

¶ 13 On 9 April 2019, Mother filed an Answer and Motion in the Cause. Mother

 moved to dismiss Grandparents’ complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule

 12(b)(6), for failure to state a claim upon which relief can be granted, arguing that

 Grandparents’ complaint “does not list even one specific fact or allegation regarding

 [Mother], or her parenting abilities to properly meet their burden under N.C. [Gen.
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 Stat. §] 50-13.1(a) to show [Mother] has either acted inconsistently with her

 constitutionally protected right to parent, or that she is an unfit [] parent” and that

 Grandparents “do not have standing to seek custody of the minor child at issue

 pursuant to N.C. [Gen. Stat. §] 50-13.1(a)” because Grandparents did not “allege an

 in loco parentis relationship with the minor child.”

¶ 14 The trial court held a hearing on Mother’s motion to dismiss on 6 May 2019.

 By order entered 12 June 2019 (“Order Denying Motion to Dismiss”), it denied

 Mother’s motion, finding and concluding that Grandparents had standing to bring

 the custody action and that Mother “engaged in conduct inconsistent with her

 protected status as a parent as demonstrated by clear and convincing evidence.”

¶ 15 A hearing was held on 2 December 2019 to address Josie’s best interests and

 determine permanent custody. The trial court entered an Amended Permanent

 Custody Order on 17 April 2020 wherein it concluded, in relevant part, that “[i]t is in

 the best interest of the minor child that the [Grandparents] have sole legal and

 physical custody of the minor child” and that Mother be granted visitation as outlined

 in the order.

¶ 16 Mother appealed the Order for Emergency Custody, the Temporary Custody

 Order, the Order Denying Motion to Dismiss, and the Amended Permanent Custody

 Order. On appeal, Mother’s arguments are directed only to the Order Denying

 Motion to Dismiss and the Amended Permanent Custody Order.
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 II. Discussion

 A. Standing

¶ 17 Mother first argues that the trial court erred by denying her motion to dismiss

 Grandparents’ complaint for custody because the trial court erroneously determined

 that Grandparents have standing to bring a custody action under N.C. Gen. Stat.

 § 50-13.1(a).

¶ 18 Standing is required to confer subject matter jurisdiction. Wellons v. White,

 229 N.C. App. 164, 176, 748 S.E.2d 709, 718 (2013). “A [trial] court’s subject matter

 jurisdiction over a particular matter is invoked by the pleading.” Boseman v. Jarrell,

 364 N.C. 537, 546, 704 S.E.2d 494, 501 (2010). At the motion to dismiss stage, all

 factual allegations in the pleadings are viewed in the light most favorable to the

 plaintiff, granting the plaintiff every reasonable inference. Grindstaff v. Byers, 152

 N.C. App. 288, 293, 567 S.E.2d 429, 432 (2002). We review de novo whether a plaintiff

 has standing to bring a claim. Fuller v. Easley, 145 N.C. App. 391, 395, 553 S.E.2d

 43, 46 (2001).

¶ 19 N.C. Gen. Stat. § 50-13.1(a) provides that “[a]ny parent, relative, or other

 person . . . claiming the right to custody of a minor child may institute an action or

 proceeding for the custody of such child.” N.C. Gen. Stat. § 50-13.1(a) (2019). The

 statute “grants grandparents the broad privilege to institute an action for

 custody . . . .” Eakett v. Eakett, 157 N.C. App. 550, 552, 579 S.E.2d 486, 488 (2003).

 “Although grandparents have the right to bring an initial suit for custody, they must
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 still overcome” the parents’ constitutionally protected rights. Sharp v. Sharp, 124

 N.C. App. 357, 361, 477 S.E.2d 258, 260 (1996).

¶ 20 To survive a motion to dismiss for lack of standing, grandparents must allege

 both that they are the grandparents of the minor child and facts sufficient to

 demonstrate that the minor child’s parent is unfit or has engaged in conduct

 inconsistent with their parental status. See, e.g., Rodriguez v. Rodriguez, 211 N.C.

 App. 267, 276, 710 S.E.2d 235, 241-42 (2011) (“[The] plaintiffs had standing to proceed

 in an action for custody pursuant to N.C. Gen. Stat. § 50-13.1(a) as they alleged they

 are the grandparents of the children and that [the] defendant had acted

 inconsistently with her parental status and was unfit because she had neglected the

 children.”) (citation omitted); Grindstaff, 152 N.C. App. at 292, 567 S.E.2d at 432

 (“[G]randparents alleging unfitness of their grandchildren’s parents have a right to

 bring an initial suit for custody[.]”).

¶ 21 Here, Grandparents alleged in their complaint, in relevant part, the following:

 4. . . . Trina Thomas and Scotty Thomas are the child’s
 paternal grandparents.

 ....

 6. [Grandparents] have standing pursuant to [N.C. Gen.
 Stat.] § 50-13.l(a) to file this action for child custody in that
 they have [] had a substantial and material contact with
 the child throughout her life in the nature of a parent and
 child.

 ....

 8. [Mother] has acted inconsistent with her constitutionally
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

protected status as a parent. She has repeatedly and
willfully failed to protect the child from her husband
[Chip].

 ....

 b. Shortly after [Carson]’s birth, [Mother] called the
 Plaintiffs to report that she had left Chip because of
 his poor treatment of her and [Josie] who was about
 four years old. However, she returned shortly
 thereafter because [Chip] refused to let her take the
 infant [Carson] with her.

 c. When [Josie] was four, she cut her hair with a pair
 of scissors. As punishment, [Chip] shaved the child’s
 head to “teach her a lesson.”

 d. Throughout the time [Josie] has been in the home
 with [Chip], he has singled her out for hostile
 treatment. He is easily agitated and frequently yells
 at [Josie] calling her names. At times he gets so
 close to [Josie]’s face, the force of his screaming has
 caused him to spit on the child.

 e. When [Josie] was eight years old, she developed
 chronic constipation. [Chip] belittled her and called
 her names. He refused to allow [Mother] to follow
 [Josie]’s doctor’s recommendations for treatment,
 saying, “She can s*** on her own. I do it every
 morning.”

 f. Frequently [Josie] is the victim of [Chip]’s unfair
 punishment. In the Spring of 2016, [Josie] stated
 that she would rather kill herself than live with
 [Chip]. As a result, she was hospitalized for mental
 health treatment.

 g. On February 19, 2019, [Chip] assaulted [Josie].
 Although he did not hit the child, he grabbed her and
 caused her to fall on the ground. [Mother] called
 [Grandparents] to the home. When [they] arrived at
 the Oxendine home, [Chip] stated, “All I got to say is
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 you better be glad your grandparents are here.”

 h. On February 20, 2019, [Mother] called
 [Grandmother], crying and asked her to come pick
 up [Josie], saying, “I need you to meet me to get
 [Josie]. Things are not working with her and Chip.”
 [Mother] admitted that Chip had told [Josie] to get
 her things and prepare to leave the home. [Mother]
 stated that she wanted to leave [Chip] but she had
 her other children to consider.

 i. By February 24, 2019, [Mother] was demanding
 that [Josie] return to her home. She accused
 [Grandparents] of calling [Cabarrus County social
 services] regarding [Chip]’s domestic violence
 incident on February 19, 2019. According to
 [Mother], the Department is investigating her home.

 j. Since that time, [Mother] has refused to allow
 [Josie] to visit [Grandparents’] home. They have had
 limited telephone contact with her. The substance
 of the calls leads them question [Josie]’s safety in the
 Oxendine home. [Mother] stated that she was not
 going to allow [Josie] to visit her grandparents until
 the [social services’] investigation was over.

 k. [Social services] investigated the Oxendine home
 after [Chip] left bruises on the minor child [Skylar].

¶ 22 Viewed in the light most favorable to Grandparents, and granting

 Grandparents the benefit of every reasonable inference, Grandparents have alleged

 both that they are Josie’s grandparents and that Mother acted inconsistently with

 her constitutionally protected status as a parent by repeatedly and willfully failing to

 protect Josie from danger and harm caused by Chip. Accordingly, Grandparents had

 standing to proceed in an action for custody of Josie pursuant to N.C. Gen. Stat. § 50-

 13.1(a).
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

¶ 23 Mother asserts that “the trial court must find that a parent has acted

 inconsistent with his or her constitutionally protected status as a parent by clear and

 convincing evidence for grandparents to have standing to seek custody of a minor

 child.” (Original in all capital letters). Mother argues that Grandparents lacked

 standing to bring this action because the trial court’s determination that Mother

 acted inconsistent with her constitutionally protected status as a parent was not

 supported by the evidence.

¶ 24 Mother confuses

 two distinct but related stages in a custody dispute
 between a parent and non-parent, namely: (1) the
 standing and pleading requirements of the complaint at
 the motion to dismiss stage, and (2) the burden of
 producing evidence at the custody hearing sufficient to
 prove that a parent has waived the constitutional
 protections guaranteed to them.

¶ 25 Gray v. Holliday, 2021-NCCOA-178, ¶19 (unpublished). Where, as here, the

 pleading alleges sufficient facts to show that plaintiffs are the grandparents of the

 minor child and that the parent is unfit or has engaged in conduct inconsistent with

 their parental status, Grandparents had standing, and the trial court had subject

 matter jurisdiction to hear the case.

 B. Conduct Inconsistent with Parental Status

¶ 26 Mother argues that the trial court erred by denying Mother’s motion to dismiss

 Grandparents’ custody action because the trial court’s determination that Mother

 “engaged in conduct inconsistent with her protected status as a parent” was not
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 supported by clear and convincing evidence.

¶ 27 “A trial court’s determination that a parent’s conduct is inconsistent with his

 or her constitutionally protected status must be supported by clear and convincing

 evidence.” Adams v. Tessener, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001). In custody

 actions, “the trial court’s findings of fact are conclusive on appeal if there is evidence

 to support them, even though the evidence might sustain findings to the contrary.”

 Owenby v. Young, 357 N.C. 142, 147, 579 S.E.2d 264, 268 (2003). Findings of fact are

 likewise conclusive on appeal if they are unchallenged. Peters v. Pennington, 210

 N.C. App. 1, 12-13, 707 S.E.2d 724, 733 (2011). We review whether the findings of

 fact support the conclusions of law de novo. Hall v. Hall, 188 N.C. App. 527, 530, 655

 S.E.2d 901, 904 (2008).

¶ 28 Even when grandparents have standing to bring a custody action, to gain

 custody they must still overcome a parent’s “constitutionally-protected paramount

 right . . . to custody, care, and control of [the child].” Petersen v. Rogers, 337 N.C. 397,

 403-04, 445 S.E.2d 901, 905 (1994). “When grandparents initiate custody lawsuits

 under [N.C. Gen. Stat.] § 50-13.1(a), . . . the grandparent[s] must show that the

 parent is unfit or has taken action inconsistent with her parental status in order to

 gain custody of the child.” Eakett, 157 N.C. App. at 553, 579 S.E.2d at 489. If,

 however, the grandparents are not able to show that the parent has lost their

 protected status, the custody claim against the parent must be dismissed. See, e.g.,

 Owenby, 357 N.C. at 148, 579 S.E.2d at 268 (reinstating the trial court’s order
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 dismissing grandparent’s custody action where grandparent “failed to carry her

 burden of demonstrating that defendant forfeited his protected status”).

¶ 29 Here, Mother challenges the following nine of the trial court’s 66 findings of

 fact in its Order Denying Motion to Dismiss as not supported by competent evidence:

 12. The minor child views [Grandfather] as the only father
 she has ever known and considers both [Grandmother] and
 [Mother] as her mother figures.

 ....

 30. [Grandparents] exercised a significant amount of
 parental responsibility for the minor child, which was
 formed and perpetuated by [Mother].

 ....

 42. [Mother] has failed to protect the minor child.

 ....

 51. That after the February 2019 incident, [Chip]
 demanded that the minor child pack her things and leave
 the Oxendine home.

 ....

 53. Based on her actions, [Mother] believed that there was
 a substantial risk of harm to the minor child if the minor
 child remained in the Oxendine home.

 ....

 55. [Mother] did not indicate that the placement would be
 temporary. [Grandparents] cared for the minor child as
 they had on numerous other occasions. [Mother] abdicated
 her parental responsibilities while [Grandparents] often
 cared for the daily needs of the minor child.
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 ....

 60. That [Mother]’s decision to demand that
 [Grandparents] return the minor child to the Oxendine
 home was adverse to the minor child.

 61. [Mother] unilaterally altered the established
 relationship between [Grandparents] and the minor child
 by ceasing all contact between the minor child and
 [Grandparents] upon being contacted by [social services].
 That this act by [Mother] was adverse to the minor child.

 ....

 63. There is a substantial risk of harm to the minor child
 while in the Oxendine home.

¶ 30 Our review of the record reveals clear and convincing evidence to support each

 of the nine challenged findings. Moreover, even in the absence of every contested

 finding, the unchallenged findings support the trial court’s conclusion that Mother

 “engaged in conduct inconsistent with her protected status as a parent[.]” See Hall,

 188 N.C. App. at 532, 655 S.E.2d at 905 (affirming a modification of custody on the

 unchallenged findings).

¶ 31 The unchallenged findings include, in relevant part:

 14. [Grandparents] have played an integral part in
 rearing the minor child. [Mother] and the minor child
 moved in with [Grandparents] in 2006 when the minor
 child was [one] year old.

 ....

 16. [Grandparents] provided housing, clothing,
 transportation[,] and financial assistance for the minor
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

child while the minor child resided in the home.

....

18. [Grandparents] continued to have ongoing and
consistent contact with the minor child after moving
from [Grandparents’] home and continued to provide
financially for the minor child. [Grandparents]
purchased clothing and other essential items for the
minor child.

19. The minor child stayed with [Grandparents] on
weekends, every Spring Break, holidays and every
summer, with the exception of summer 2016 when the
minor child was hospitalized. The minor child was in
the home of [Grandparents] every weekend unless
prevented by [Chip]. Friends and neighbors of
[Grandparents] were accustomed to seeing the minor
child with [Grandparents] during the times mentioned
above.

20. [Grandparents] have been involved in the minor
child’s education by assisting with homework and school
projects. [Grandparents] purchased school clothing and
supplies each year for the minor child. In February
2019, [Grandparents] purchased a computer for the
minor child.

21. [Grandparents] supported the minor child in her
extracurricular activities and paid the fees for the minor
child to play sports. The minor child also attended social
and family gatherings events with [Grandparents].

....

31. [Mother] relied on [Grandparents] in a parental
capacity for the minor child and intended for
[Grandparents] to shoulder the parental responsibility.

32. [Grandmother] has been a constant emotional
resource for the minor child and [Mother], especially
with matters relating to the minor child and the
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

dynamics in [Mother]’s household.

....

34. [Mother] benefitted by sharing the decision-making,
caretaking, and financial responsibility for the minor
child with [Grandparents]. . . .

....

37. The minor child is in fear of [Chip] and does not
believe that [Mother] makes an effort to protect her.

38. During the summer of 2016, the minor child was
hospitalized for mental health treatment after the
minor child stated that she would rather kill herself []
than live with [Chip].

39. During the minor child’s hospital stay,
[Grandmother] was at the hospital each day with the
minor child. [Mother] told [Grandmother] that she was
unable to be at the hospital daily because [Chip] stated
that [Mother] did not need to be there because she had
other children at home. . . .

40. An incident occurred in the Oxendine home in
February 2019 where the minor child ended up on the
floor after being confronted by [Chip].

41. [Mother] was in the home, but did not intervene.

....

43. [Mother] admits that [Chip] and the minor child
have had arguments that have been inappropriate.

....

45. The minor child does not feel welcome in the
Oxendine home, suffers from constant anxiety and feels
that she is treated differently from her other siblings who
reside in the Oxendine home.
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 ....

 48. That [Mother], [Chip] nor the minor child have
 demonstrated the ability to deescalate conflicts.

 49. The minor child’s presence in the Oxendine home
 has created a hostile environment for the minor child.

 50. The minor child has been unable to cope in the
 Oxendine home.

 ....

 52. [That after the February 2019 incident], [Mother]
 called [Grandmother] and asked her to immediately
 meet and keep the minor child due to things not working
 out between [Chip] and the minor child.

 ....

 54. [Mother] voluntarily placed the minor child with
 [Grandparents] and provided no definitive timeframe,
 oversight or instructions.

 ....

 64. [Mother] has engaged in conduct inconsistent with
 her protected status as a parent as demonstrated by
 clear and convincing evidence.

¶ 32 These unchallenged findings show that Mother failed to protect Josie from

 Chip’s abusive behavior and inappropriate discipline. This failure alone is conduct

 inconsistent with Mother’s protected status as a parent. See Sharp, 124 N.C. App. at

 361, 477 S.E.2d at 260 (allegations in complaint sufficient to survive motion to

 dismiss where grandparents alleged that parent’s actions put her children at a

 “substantial risk of harm”); Grindstaff, 152 N.C. App. at 293, 567 S.E.2d at 432

 (allegations in complaint sufficient to survive motion to dismiss where grandmother
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 alleged parents had “not shown they are capable of meeting the needs of the children

 for care and supervision”). The unchallenged findings also show that, by her

 volitional acts, Mother “relinquish[ed] otherwise exclusive parental authority to”

 Grandparents. See Rodriguez, 211 N.C. App. at 277, 710 S.E.2d at 242 (quotation

 marks and citation omitted). Such voluntary relinquishment is the “gravamen” of

 inconsistent conduct. Id.

¶ 33 Mother additionally argues that, by finding that she “had little or no income,”

 the trial court improperly relied on her socioeconomic status in its determination that

 she acted inconsistent with her parental rights.

¶ 34 It is true that a parent’s socioeconomic status is not relevant to a determination

 of a parent’s unfitness or acts inconsistent with a parent’s constitutionally protected

 status. Dunn v. Covington, 272 N.C. App. 252, 265, 846 S.E.2d 557, 567 (2020) (citing

 Raynor v. Odom, 124 N.C. App. 724, 731, 478 S.E.2d 655, 659 (1996)). However,

 where the remaining findings are sufficient to support the court’s conclusion that

 Mother acted inconsistently with her parental status, any potential error was

 harmless. See In re S.R.F., 376 N.C. 647, 2021-NCSC-5, ¶15. In summary, the

 challenged findings of fact are supported by clear and convincing evidence. The

 unchallenged findings of fact, by themselves and together with the challenged

 findings, support the trial court’s conclusion that Mother “engaged in conduct

 inconsistent with her protected status as a parent[.]”
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 C. Best Interests Determination

¶ 35 Mother argues the trial court abused its discretion by concluding, “it is in the

 best interest of the minor child that [Grandparents] have sole legal and physical

 custody of the minor child.”

¶ 36 Where a parent’s conduct is determined to be inconsistent with their

 constitutionally protected status, the trial court will determine custody using the

 “best interest of the child” standard. Tessener, 354 N.C. at 62, 550 S.E.2d at 502.

 “Before awarding custody of a child to a particular party, the trial court must conclude

 as a matter of law that the award of custody to that particular party ‘will best promote

 the interest and welfare of the child.’” Steele v. Steele, 36 N.C. App. 601, 604, 244

 S.E.2d 466, 468 (1978) (quoting N.C. Gen. Stat. § 50-13.2(a)).

¶ 37 The standard of review for a best interests determination in a custody dispute

 is well-established:

 [T]he trial court’s findings of fact are conclusive on appeal
 if supported by substantial evidence, even if there is
 sufficient evidence to support contrary findings. . . .
 Substantial evidence is such relevant evidence as a
 reasonable mind might accept as adequate to support a
 conclusion. . . . Unchallenged findings of fact are binding
 on appeal. . . . The trial court’s conclusions of law must be
 supported by adequate findings of fact. . . . Absent an abuse
 of discretion, the trial court’s decision in matters of child
 custody should not be upset on appeal.

 Peters, 210 N.C. App. at 12-13, 707 S.E.2d at 733 (quotation marks and citations

 omitted).
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

¶ 38 Mother challenges the following 13 of the trial court’s 75 findings of fact in its

 Amended Permanent Custody Order as not supported by the evidence:

 8. . . . [Mother]’s [other] children [i.e. Skylar, Carson, and
 Diane] considered the Plaintiffs [Trina and Scotty Thomas]
 as grandparents prior to the initiation of this action.

 ....

 11. . . . [Mother] stated that [Chip] overstepped her and
 punished [Josie] inappropriately. [Grandparents] asked
 [Mother] if they could talk with [Chip] and [Mother] stated
 that it would not help to do so.

 12. [Chip] and the minor child have had arguments and
 interactions that have been inappropriate. [Mother] has
 not appropriately intervened.

 ....

 15. . . . [Mother] has not received the necessary
 psychological education and treatment to help her cope
 within the Oxendine family dynamics.

 ....

 30. [Mother] has not shown any interest in visiting or
 knowing anything about [Josie]’s school. [Grandmother]
 has provided updates and sent pictures to [Mother]
 regarding [Josie] even though [Mother] rarely responds.

 31. [Mother] does not effectively co-parent and
 demonstrates an unwillingness to do so. [Mother]’s actions
 demonstrate that she is bitter towards [Josie] and
 [Grandmother].

 32. . . . [Mother]’s actions appear to be punitive in nature
 and are passive aggressive.

 ....

 40. . . . It was inappropriate and against [Josie]’s best
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 interest for the Oxendines to isolate [Josie] from
 [Grandparents] as a punishment.

 ....

 44. Over time, [Josie] was shunned by her family. . . .

 ....

 54. [Mother] has not taken advantage of the services
 offered to her and her family and failed to comply with the
 recommendations made to help her effectively parent
 [Josie] and provide [Josie] with a safe and healthy home
 environment.

 55. [Mother] has failed to protect the minor child while in
 her care. [Mother] has failed to participate and/or
 demonstrate skills on how to deescalate conflicts within
 her household and with [Josie].

 56. During various points of her life, [Josie] has been
 withheld from people who have been caregivers to her.
 [Josie] has had significant routine experience to events
 such as hitting, choking, pushing, shaking, yelling, and
 punishment to a point where bruising occurred.

 ....

 60. . . . [Mother] shared with [Grandmother] that [Chip]
 told her that he can’t be around [Josie] and presented
 [Mother] with an ultimatum. . . .

¶ 39 Our review of the record reveals clear and convincing evidence to support each

 of the challenged findings. Moreover, even in the absence of every contested finding,

 the unchallenged findings support the trial court’s conclusion that “it is in the best

 interest of the minor child that [Grandparents] have sole legal and physical custody

 of the minor child.” These unchallenged findings include:

 14. On November 28, 2010, a report was made to the
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

Department of Social Services alleging that [Chip] bruised
[Skylar]. [Skylar]’s paternal grandparents observed
bruising on [Skylar] and took her to the hospital. . . .
[Mother] indicated that she did not know about the
bruising until after [Skylar] was taken to the hospital.
[Mother] confirmed that [Chip] caused the bruising on
[Skylar]. . . . [Chip] admitted that he hit [Skylar] out of
anger by pulling her pants down and spanking her with his
hand. . . .

....

16. The social worker involved with the Oxendine family
described [Mother] as being nonchalant in her disciplining
and allowed [Chip] to take on this responsibility although
he didn’t have any experience. . . . The social worker also
noted that [Mother] told her she would start counseling for
[Josie]. . . . No evidence was presented to show that
[Mother] followed through with obtaining counseling for
[Josie] or herself at this time. . . .

....

23. [Josie] needs consistency and structure.
[Grandparents] have [Josie] on a schedule.

....

27. . . . [Since living with Grandparents], [Josie]’s grades
have improved and [she] is progressing in therapy.
[Josie]’s self-esteem has improved.

....

38. [Chip] and [Josie] have a tumultuous relationship.
From the onset of the relationship between [Mother] and
[Chip], [Grandparents] noticed that Chip was overly harsh
in punishing [Josie]. [Grandparents] witnessed [Chip]
calling [Josie] names in front of [Mother], but [Mother]
would not do anything.

....
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

40. [Chip] would often tell [Josie] to pack her things and
leave. There were other times when [Chip] would withhold
[Josie]’s visits with [Grandparents]. The Oxendines
believe that [Josie]’s visiting with [Grandparents] was the
“only thing” that [Josie] seemed to like. . . . It was
inappropriate and against [Josie]’s best interest for the
Oxendines to isolate [Josie] from [Grandparents] as
punishment.

....

46. In May 2016, [Josie] threw a note downstairs stating
that she wanted to kill herself if she had to continue living
with [Chip]. [Josie] was hospitalized on May 13, 2016 at
Atrium Health until a bed became available at Brynn Marr
Hospital. [Grandmother] stayed with [Josie] while
hospitalized. [Mother] was unable to stay because [Chip]
relayed that [Mother] had other kids at home to care for.

....

48. . . . [Josie] received an Admissions Assessment and
reported that she will kill herself if she must go back to live
with her stepfather. [Josie] reported that her stepfather is
abusive and physically punishes her leaving whip marks.
[Josie] also reported having nightmares about her
stepfather. . . .

49. . . . [Josie] reported that she and her mother “go at it”
and “yell at each other.” [Josie] expressed that she did not
feel safe around [Chip] and was scared [Chip] would get
mad and hit her mother. [Josie] also expressed that “about
every day” she (Josie) and [Chip] would “get into
arguments.” . . .

....

53. [Josie] has consistently cried out for help for years.
[Mother] failed to ensure that [Josie]’s psychological and
emotional needs were met.

....
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

57. An altercation occurred between [Josie] and [Chip] on
February 19, 2019. Prior to said altercation, [Josie] and
[Skylar] were arguing about a cellphone while they both
were in the bathroom . . . [Chip] got out of bed and headed
towards the bathroom to get the phone. . . .

58. [Josie] ended up on the floor after being confronted by
[Chip]. [Chip] yelled at [Josie] causing his spit to come in
contact with [Josie]’s face. [Chip] demanded that [Josie]
pack her things and leave the Oxendine home. The next
day, [Mother] called [Grandmother] and asked her to meet
her and keep [Josie] due to things not working out between
Chip and [Josie].

....

60. . . . [Josie] reported that [Chip] grabbed her by her
shoulders, “flinging her to the ground.” When talking
about this event [Mother] told [Grandparents] that [Chip]
“bowled her (Josie) over.” [Mother] called [Grandmother]
and indicated that [she] would need to meet her to pick up
[Josie] because “things weren’t working out with [Josie]
and Chip.” . . . [Josie] shared that she heard [Mother] and
[Chip] fighting and [Chip] kept saying that [Josie] is the
problem. [Mother] subsequently sided with [Chip]. [Josie]
shared, “I can’t take it anymore. I hate this family.”

....

62. The April 25, 2019 assessment from Creative
Counseling and Learning Solutions found that [Josie] has
experienced a threat of serious harm by her stepfather
[Chip] on numerous occasions from ages 6-12. [Josie] has
heard about the Oxendines physically fighting, hitting,
slapping, kicking and pushing each other. . . . [Josie] has
repeatedly been told that she is no good, been yelled at in
scary ways, and has received threats of abandonment, and
removal by her stepfather. This conduct has worsened
throughout [Josie]’s life. [Josie] does not feel safe in the
Oxendine home. The court adopts these findings.

....
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

64. The court adopts the findings of the April 25, 2019
assessment that [Josie] has not experienced a singular
traumatic experience, [but] rather years of events which
are leading to both behavioral and emotional responses to
which [Josie] feels she has no control. [Josie] has directly
experienced violent acts, both toward her as well as her
mother. This includes violence to her in the form of harsh
punishments, punishments resulting in bruises to her
sister, and violence toward her mother. She has also
learned about events occurring to others. [Josie]
experiences excessive worry that something else is going to
happen and is always “walking on egg shells.” [Josie] has
experienced intrusion symptoms including recurring
distressing dreams in which the content and effect of the
dream are related to the trauma events, dissociative
reactions in which she reports feeling as if the trauma
events are occurring in the present, intense and prolonged
psychological distress at exposure to internal and external
cues that resemble an aspect of the trauma events, such as
fighting and heat. . . . [She experiences] persistent and
distorted cognitions about the cause of the traumatic event,
negative emotional state, including horror, fear, guilt,
shame, anger, and vindictiveness. [Josie] experiences
diminished interest in significant activities and will often
provoke problems in what was a pleasant experience.
[Josie] feels estranged from others. She additionally is
experiencing reactivity symptoms including irritable
behavior and anger responses, hypervigilance, exaggerated
startle response, and poor concentration problems.

65. The family dynamics are such that [Josie] is exposed to
physical and emotional abuse while in the care of [Mother].

66. [Josie] has a need to reside in a safe environment. [She]
needs emotionally healthy caretakers who are actively
involved in her life. . . .

....

68. . . . [Mother] expressed no intent of separating from
[Chip].
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

¶ 40 The challenged findings of fact are supported by competent evidence and the

 unchallenged findings, by themselves and together with the challenged findings,

 support the trial court’s conclusion that “it is in the best interest of [Josie] that

 [Grandparents] have sole legal and physical custody of the minor child.” The trial

 court did not abuse its discretion in granting Grandparents custody. See Cox v. Cox,

 133 N.C. App. 221, 228, 515 S.E.2d 61, 67 (1999) (“A trial court is given broad

 discretion in determining the custodial setting that will advance the welfare and best

 interest of minor children.”).

 D. Order that Mother Complete a Psychiatric Evaluation

¶ 41 Mother argues that the trial court abused its discretion when it “condition[ed]

 [her] custodial rights upon undergoing a psychiatric evaluation when there was no

 evidence that [her] mental health affected her parenting of the minor child, and

 [ordered her] to take prescription medication.”

¶ 42 “In cases involving child custody, the trial court is vested with broad

 discretion.” Browning v. Helff, 136 N.C. App. 420, 423, 524 S.E.2d 95, 97 (2000). “The

 decision of the trial court should not be upset on appeal absent a clear showing of

 abuse of discretion.” Id. (citation omitted). This Court has affirmed the decisions of

 trial courts ordering a psychological evaluation. See, e.g., Maxwell v. Maxwell, 212

 N.C. App. 614, 620-21, 713 S.E.2d 489, 493-94 (2011) (affirming the trial court’s

 decision to order a mental health evaluation as a condition of father’s visitation

 rights); Pass v. Beck, 156 N.C. App. 597, 601, 577 S.E.2d 180, 182 (2003) (holding that
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 “the trial court did not abuse its discretion in delaying determination of the best

 interests of the child regarding visitation pending a recommendation from a

 psychologist”); Rawls v. Rawls, 94 N.C. App. 670, 676-77, 381 S.E.2d 179, 183 (1989)

 (holding that the trial court did not abuse its discretion by requiring a defendant to

 consult a psychiatrist or a psychologist before awarding specific visitation rights).

¶ 43 Here, the court ordered:

 19. [Mother] shall undergo a psychological evaluation and
 comply with all recommended education and treatment.
 [Mother] shall reveal to the treatment evaluator/ provider
 her prior diagnosis and suicide attempt and the name and
 contact information of her past and current treatment
 provider(s). [Mother] shall provide any documentation
 requested by the treatment evaluator/ provider including a
 release of medical records. In addition [Mother] shall
 provide the treatment evaluator/provider with a copy of
 this Order and the April 10, 2019 temporary custody order.
 [Mother] shall also request to be evaluated to determine
 the necessity for her to be prescribed any medication.
 [Mother] shall keep all medical appointments and follow
 the treatment plan of her medical providers. [Mother]
 shall comply with taking her medication as prescribed by
 her medical provider.

¶ 44 Contrary to Mother’s assertion, the trial court did not “condition her custodial

 rights upon undergoing a psychiatric evaluation.” Nonetheless, such a condition is

 permissible and ordering Mother to undergo a psychiatric evaluation was within the

 broad discretion of the trial court. See Maxwell, 212 N.C. App. at 621, 713 S.E.2d at

 494.

¶ 45 The following findings of fact support the trial court’s order:
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 15. During the [2011 social services investigation],
 [Mother] told the social worker that she had been
 diagnosed with PTSD and Borderline Personality Disorder.
 She also stated that she was diagnosed as manic and had
 a prior suicide attempt. [Mother] stated that she attended
 Daymark and was taking medication but stopped because
 it made her sleep a lot. [Mother] has not received the
 necessary psychological education and treatment to help
 her cope within the Oxendine family dynamics.

 16. The social worker involved with the Oxendine family
 described [Mother] as being nonchalant in her disciplining
 and allowed [Chip] to take on this responsibility although
 he didn’t have any experience. . . . The social worker also
 noted that [Mother] told her she would start counseling for
 [Josie]. . . . No evidence was presented to show that
 [Mother] followed through with obtaining counseling for
 [Josie] or herself at this time. . . .

 ....

 67. [Mother] . . . need[s] parenting classes, coping skills,
 individual therapy and family therapy.

¶ 46 Mother challenges the portion of finding of fact 15 that states she “has not

 received the necessary psychological education and treatment to help her cope within

 the Oxendine family dynamics.” Cabarrus County social services’ records indicate

 that Mother was diagnosed with PTSD and Borderline Personality Disorder in 2008

 and stopped taking her medication. She was diagnosed as manic and had a prior

 suicide attempt. Further, there was no evidence before the trial court that Mother

 and Chip engaged in therapy or services offered to help them effectively parent,

 including the recommended course of in-home, family therapy and training.

¶ 47 This evidence was competent to support the challenged finding. Based on a
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 review of the findings, it is apparent that the trial court’s decision to require Plaintiff

 to undergo a psychological evaluation and comply with all recommendations did not

 represent an abuse of discretion. See id.

 E. Order that Chip Complete Programming

¶ 48 Mother finally argues that the trial court abused its discretion when it ordered

 Chip to complete, and provide the court with proof of completion, a series of parenting

 classes and trainings, and anger management and substance abuse evaluations.

 Mother asserts that a trial court may not condition a parent’s custodial and visitation

 rights on the actions of a third-party. Mother mischaracterizes the court’s order, and

 her argument is without merit.

¶ 49 The challenged portion of the Amended Permanent Custody Order does not

 condition Mother’s visitation with Josie on Chip’s compliance with the order; rather,

 the order conditions Chip’s ability to have contact with Josie on his compliance with

 the order. Mother argues that these conditions violate Chip’s constitutional due

 process rights. We decline to address this argument as Mother does not have

 standing to assert Chip’s constitutional rights. Transcon. Gas Pipe Line Corp. v.

 Calco Enters., 132 N.C. App. 237, 247, 511 S.E.2d 671, 678 (1999) (“Ordinarily, one

 may not claim standing . . . to vindicate the constitutional rights of some third party.”)

 (citation omitted).

¶ 50 The order does state that Mother’s “visitation shall occur at the Oxendine home

 so long as Chip . . . is not present in the home at any time during the weekend of
 THOMAS V. OXENDINE

 2021-NCCOA-661

 Opinion of the Court

 [Mother’s] visitation. [Mother’s] visitation shall immediately cease if Chip . . . is/has

 been in the home during the visitation period.”

¶ 51 Trial courts possess broad discretion to fashion visitation arrangements

 appropriate to the situations before them, and trial courts are always guided by the

 best interests of the child. Burger v. Smith, 243 N.C. App. 233, 239, 776 S.E.2d 886,

 891 (2015). To that end, a trial court has the discretion to prohibit the exercise of

 visitation rights by a non-custodial parent in the presence of a specified person if the

 evidence demonstrates that exposure to the prohibited person would adversely affect

 the child. See Harris v. Harris, 56 N.C. App. 122, 125, 286 S.E.2d 859, 860 (1982); cf.

 Mongerson v. Mongerson, 285 Ga. 554, 555-56, 678 S.E.2d 891, 894 (2009).

¶ 52 Here, there was ample competent evidence that exposure to and contact with

 Chip adversely affected Josie’s welfare. Accordingly, the trial court did not abuse its

 discretion and this argument is overruled.

 III. Conclusion

¶ 53 For the reasons stated above, we affirm the orders of the trial court.

 AFFIRMED.

 Judges DILLON and WOOD concur.